**FOR PUBLICATION**



FILED

Sep 06 2012, 9:30 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MATTHEW J. McGOVERN**
Anderson, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**GEORGE P. SHERMAN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| PATRICK NICHOLS, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 31A01-1112-CR-599 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE HARRISON SUPERIOR COURT
The Honorable Roger D. Davis, Judge
Cause No. 31D01-1106-FC-411

**September 6, 2012**

**OPINION - FOR PUBLICATION**

**CRONE, Judge**

**Case Summary**

Patrick Nichols appeals his convictions for class C felony burglary, class D felony theft, and class A misdemeanor criminal mischief, contending that in closing argument, the prosecutor violated his Fifth Amendment privilege against self-incrimination by improperly commenting upon his decision not to testify and that the resulting error is fundamental. We agree and therefore reverse his convictions and remand for a new trial.

**Facts and Procedural History**

At 3:19 a.m., on April 14, 2011, the burglary alarm sounded in the Wilson General Store and gas station in Elizabeth. Store owner Emmett Wilson and Harrison County Police Officer Steven Coleman went to the store. They observed that the air conditioning unit had been removed from the store's front window and that the alarm system had been ripped off the wall. They also found that the locked cigarette cabinet had been pried open and the cigarette packages and cartons had been removed and placed in garbage bags. Officer Coleman searched the store but did not find anyone. Wilson put the cigarettes back in the cabinet, cleaned up the store, and went home.

Between 6:00 and 7:00 a.m., someone placed multiple phone calls from the store. No one was authorized to make calls from the store before 8:00 a.m. The store's phone records reveal a list of long-distance phone calls made from the store between 6:00 and 7:00 a.m. The phone records indicate that one of the phone numbers belonged to the cell phone of Nichols's mother, Helen Nichols, with whom Nichols lived. State's Ex. 1, Tr. at 118-19. At trial, Helen claimed that she had been asleep, having taken a sleeping pill earlier, and did not

2

hear her cell phone ring. Another phone number listed on the store's phone records belonged to a former coworker of Nichols. Tr. at 229.

Around 6:45 a.m., Nichols's ex-girlfriend, Erica Lorenzo, received a phone call on her "pay-as-you-go"-phone from a phone number she did not recognize. *Id*. at 142. She answered and discovered that it was Nichols. He told her that "he was at Elizabeth gas station" and offered her cigarettes and money to pick him up, but she declined. *Id*. at 145-46. Nichols also asked her if she knew anyone who could pick him up, but she did not. Later that day, Lorenzo called the number from which Nichols had phoned her and discovered that the number belonged to Wilson General Store, and she called the police. The store's phone records do not list Lorenzo's phone number among the numbers called between 6:00 and 7:00 a.m. Officer Coleman looked at the display on Lorenzo's cell phone, which indicated that she received a call from the store at 6:48 a.m. on April 14. *Id*. at 208-09.

Sometime after 7:00 a.m., Pamela Stewart was driving past Wilson General Store and saw a person standing near a purple PT Cruiser in the alley adjacent to the store. She saw another person sitting in the Cruiser's driver's seat. She also saw that the metal siding on the store had been pried open. The person in the alley got into the Cruiser, and they drove off. Stewart followed them and wrote down the vehicle's license plate number, which she provided to police. Later investigation revealed that Helen had a purple PT Cruiser with a license plate number that differed by only one "alpha character" from the license plate number that Stewart provided to police. *Id*. at 114-15.

3

Also sometime after 7:00 a.m., Wilson returned to the store. He was entering the store's back door when a woman ran up to him, gave him a license plate number, and told him that someone was exiting the "sliding doors" in the alley. *Id*. at 65. He went to the alley and saw that the metal siding on the store had been pried open. Inside the store, he discovered that the cigarette cabinet had been pried open again and all the cigarettes were gone.

The State charged Nichols with class C felony burglary, class D felony theft, and class A misdemeanor criminal mischief. At trial, the State presented the testimony of Wilson, Officer Coleman, Lorenzo, and Stewart. The defense presented the testimony of Helen and Nichols's current girlfriend, Natalie Isaac. During closing argument, the prosecutor reviewed the evidence that Officer Coleman had gathered and described it as "not a lot." *Id*. at 343. The prosecutor told the jury that the "crucial evidence in this case is Erica Lorenzo," and asked, "What motive did she have to make this up?" *Id*. The prosecutor later stated,

> Now I usually don't comment on a person's [F]ifth [A]mendment right but I'm gonna make an exception in this case and … and the Court's gonna instruct you, already has, not to consider that[1] as any evidence. I had a case one time that went to trial and it was two motorcycle outlaws. I was trying … trying one first. He got convicted and then I called him as a witness in the second case. He lost his memory. And so I tried the other outlaw and, uh, I'm telling you our evidence was razor thin and, uh, the defendant had a, I consider a really good defense attorney. I don't think he's practicing any more. He's out of Jeff. He and I used to be enemies and then we became friends but beyond that in that case the defendant did take the stand and testify. And he was convicted and the foreman was an acquaintance of mine, of the jury, and

---

[1] "[T]hat" apparently refers to argument of counsel and not the defendant's Fifth Amendment right against self-incrimination. The State agrees that the prosecutor was telling the jury that it could not consider his comments as evidence. Appellee's Br. at 6 (citing Tr. at 346).

4

told me afterwards and every time I saw him afterwards, if the defendant had not have testified he would have been a free man.

So there are reasons that people exercise their [F]ifth [A]mendment right, valid reasons. And I think in that one, like I said I thought the case was … our case was razor thin by it being a murder trial, I still do, and there was just one little item of evidence that the defendant testified to and that's what the jury used to convict him. Like, uh, Johnny Martin told me, and he was the foreperson of the jury, for years every time I'd see him he'd say if he hadn't testified he'd been a free man.

I'm still wondering, uh, what motive there is for Erica to call dispatch and say, look, I got a call from my ex-boyfriend at 6:48 a.m. and he wanted me to come to Elizabeth and pick him up at a gas station.

*Id*. at 346-47. Nichols's defense counsel did not object. The jury found Nichols guilty as charged.

## Discussion and Decision

Nichols asserts that his convictions must be reversed because the prosecutor's comments on his Fifth Amendment right against self-incrimination constitute prosecutorial misconduct rising to the level of fundamental error. Generally, in order to properly preserve a claim of prosecutorial misconduct for appeal, a defendant must not only raise a contemporaneous objection, but he must also request an admonishment; if the admonishment is not given or is insufficient to cure the error, then he must request a mistrial. *Cooper v. State*, 854 N.E.2d 831, 835 (Ind. 2006). Nichols concedes that he did not object to the prosecutor's comments and therefore did not properly preserve his claim.

To prevail on a claim of prosecutorial misconduct that has been procedurally defaulted, the defendant must establish not only the grounds for the prosecutorial misconduct, but also the additional grounds for fundamental error. *Id*. In reviewing a claim

of prosecutorial misconduct, we "'determine (1) whether the prosecutor engaged in misconduct, and if so, (2) whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she would not have been subjected.'" *Booher v. State*, 773 N.E.2d 814, 817 (Ind. 2002) (quoting *Coleman v. State*, 750 N.E.2d 370, 374 (Ind. 2001)). "Whether a prosecutor's argument constitutes misconduct is measured by reference to case law and the Rules of Professional Conduct." *Cooper*, 854 N.E.2d at 835. "The gravity of peril is measured by the probable persuasive effect of the misconduct on the jury's decision rather than the degree of impropriety of the conduct." *Id.*

Fundamental error is an "extremely narrow exception" to the contemporaneous objection rule that allows a defendant to avoid waiver of an issue. *Id.* For a claim of prosecutorial misconduct to rise to the level of fundamental error, it must "make a fair trial impossible or constitute clearly blatant violations of basic and elementary principles of due process and present an undeniable and substantial potential for harm." *Booher*, 773 N.E.2d at 817 (citation, quotation marks, and brackets omitted). "The element of harm is not shown by the fact that a defendant was ultimately convicted." *Davis v. State*, 835 N.E.2d 1102, 1107 (Ind. Ct. App. 2005), *trans. denied* (2006). "Rather, it depends upon whether the defendant's right to a fair trial was detrimentally affected by the denial of procedural opportunities for the ascertainment of truth to which he would have been entitled." *Id.* at 1107-08. "The mere fact that an alleged error implicates constitutional issues does not establish that fundamental error has occurred." *Schmidt v. State*, 816 N.E.2d 925, 945 (Ind.

6

Ct. App. 2004) (citing *Wilson v. State*, 514 N.E.2d 282, 284 (Ind. 1987)), *trans. denied.* (2005).

The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." This privilege extends to the States through the Fourteenth Amendment. *Withrow v. Williams*, 507 U.S. 680, 689 (1993). In *Griffin v. California*, 380 U.S. 609 (1965), the United States Supreme Court held that the Fifth Amendment prohibits the prosecution from commenting on a defendant's decision not to testify at trial. *See also Ziebell v. State*, 788 N.E.2d 902, 913 (Ind. Ct. App. 2003) (stating that Fifth Amendment prohibits prosecutor from commenting at trial on defendant's decision not to testify). The *Griffin* Court noted that a comment on the defendant's refusal to testify is "a remnant of the inquisitorial system of criminal justice, which the Fifth Amendment outlaws." *Id.* (citation and quotation marks omitted).

"'The Fifth Amendment privilege against compulsory self-incrimination is violated when a prosecutor makes a statement that is subject to reasonable interpretation by a jury as an invitation to draw an adverse inference from a defendant's silence.'" *Boatright v. State*, 759 N.E.2d 1038, 1043 (Ind. 2001) (quoting *Moore v. State*, 669 N.E.2d 733, 739 (Ind. 1996)). The defendant bears the burden of showing that a comment improperly penalized the exercise of the right to remain silent. *Moore*, 669 N.E.2d at 739.

Nichols argues that the prosecutor's comment was similar to those in *Reynolds v. State*, 797 N.E.2d 864 (Ind. Ct. App. 2003), and *Herron v. State*, 801 N.E.2d 761 (Ind. Ct. App. 2004), in which we concluded that the prosecutors improperly commented upon the

7

defendant's failure to testify, resulting in fundamental error.  In *Reynolds*, the prosecutor

stated,

> Was [sic] Aaron and Rachel [two of the State's witnesses] both lying?
> [Reynolds] takes the 5th Amendment.  You take the 5th Amendment when you
> got something to be concerned about. Incriminating yourself.  5th Amendment.
> My constitutional right not to incriminate myself.  That's what that means.  So
> in order for that to apply you have to have done something to incriminate
> yourself.

797 N.E.2d at 868 (citation omitted).[2]  In *Herron*, the prosecutor stated in closing that "but as

for not presenting the gun to you, that actually fired those bullets, members of the jury, right

over there at that table, that's the only one in the courtroom that can certainly tell us where

that gun is."  801 N.E.2d at 765.

Here, the prosecutor specifically stated that he did not normally comment upon a

defendant's decision to exercise Fifth Amendment rights but that he was going to make an

exception in this case.  The jury reasonably could have interpreted this to mean that whatever

the prosecutor was going to say next related to Nichols's decision to exercise his Fifth

Amendment privilege against self-incrimination.  The prosecutor then discussed at length

another case in which the evidence was extremely thin but the defendant was convicted

because he chose to testify and in testifying he provided the jury with evidence of his guilt.

The prosecutor stated that the defendant testified "about one little item of evidence," and

---

[2] Nichols asserts that the *Reynolds* court held that when a prosecutor commits fundamental prosecutorial misconduct, "the trial court must *sua sponte* interrupt the prosecutor and admonish the jury." Appellant's Br. at 13.  We disagree.  In *Reynolds*, the court made the unremarkable statement that "when an improper statement by the prosecutor amounts to fundamental constitutional error, no request for admonition is required."  797 N.E.2d at 869.  By definition, when this Court is considering whether a prosecutor committed *fundamental* error, it means that the defendant failed to properly preserve his or her claim by objecting and requesting an admonishment.

8

"that's what the jury used to convict him." Tr. at 346-47. The prosecutor *twice* told the jury that the foreman told him that if the defendant had not testified, he would have been "a free man." *Id*. The jury reasonably could have inferred that the prosecutor was suggesting that Nichols decided not to testify so as to avoid incriminating himself. We conclude that the prosecutor's comments reasonably could be interpreted as an invitation to draw an adverse inference from Nichols's silence. *See Boatright*, 759 N.E.2d at 1043. In fact, we think it is obvious that the prosecutor was suggesting that the jury draw an inference of guilt from Nichols's decision not to testify. Given the obviousness of the prosecutor's comments and the fact that the evidence of guilt was not overwhelming in this case, we conclude that the comments placed Nichols in a position of grave peril and constituted clearly blatant violations of basic and elementary principles of due process that presented an undeniable and substantial potential for harm.[3] *See Booher*, 773 N.E.2d at 817.

The State appears to concede that the prosecutor's remarks were improper but argues that the impropriety does not result in fundamental error, citing *Owens v. State*, 937 N.E.2d 880 (Ind. Ct. App. 2010), *trans. denied* (2011). In *Owens*, the defendant was accused of child molesting, and the victim, C.R., testified at trial. The prosecutor stated in closing that "[u]ltimately, you can rely on [C.R.'s] testimony. And in all honesty, in large part, if not exclusively, that's what you have to rely on. Because the reality is, other than Mr. Owens, she is the only one who knows what happened to her that night." *Id*. at 894 (citation and

---

[3] We observe that the prosecutor told the jury that the trial court had and would instruct them not to consider his comments as evidence. Tr. at 346. Such comments do not inoculate the prosecutor from subsequent improper comments.

9

quotation marks omitted). We concluded that the prosecutor's statement reasonably could have been interpreted as an invitation to draw an adverse inference from the defendant's failure to testify. *Id.* However, we concluded that the improper comment did not rise to the level of fundamental error because the comment was an isolated statement in a trial in which the victim testified and was vigorously cross-examined and recross-examined and the victim's mother and investigating detective both testified and were vigorously cross-examined.

The State contends that fundamental error did not occur because (1) the prosecutor did not directly state that Nichols invoked his Fifth Amendment right not to testify in order to avoid incriminating himself and (2) jury instructions cured any error. The first contention is meritless. As we have already concluded, the prosecutor's comments were an obvious invitation to the jury to draw an adverse inference from Nichols's failure to testify. Moreover, the "Fifth Amendment protects a defendant from having the prosecution make direct or indirect comments regarding their silence." *Hand v. State*, 863 N.E.2d 386, 396 (Ind. Ct. App. 2007) (citing *United States v. McClellan*, 165 F.3d 535, 548 (7th Cir. 1999)).

As for the jury instructions, the State asserts that the trial court instructed the jury that it must not consider the attorneys' statements as evidence, that Nichols must not be convicted on suspicion or speculation, and that Nichols was not required to present any evidence to prove his innocence or explain anything. *Id.* at 23, 367; 20, 365; 19, 364. The prosecutor's comments here go to speculation regarding the invocation of the Fifth Amendment right, not its existence. We are unpersuaded that any of these instructions mitigated the peril or cured

10

the harm that the prosecutor's comment created by so obviously suggesting to the jury that Nichols's did not testify so as not to incriminate himself.

Based on the forgoing, we conclude that the prosecutor's improper comments violated Nichols's Fifth Amendment rights and resulted in fundamental error. We therefore reverse Nichols's convictions and remand for a new trial.

Reversed and remanded.

RILEY, J., and BAILEY, J., concur.